JAMES E. FORRISTER, Appellant, v. ELIZABETH SULLIVAN et al.

Division One, November 30, 1910.

1. AMENDED PLEADING: Departure: Preserved for Review. By answering over to the amended petition defendants waive the departure, if there was one. Thereafter they have the right to introduce the abandoned petition as evidence, as an admission by plaintiff against interest and as bearing on the issue of a definite contract in the suit for specific performance, and if so introduced it can be preserved for review if made a part of the bill of exceptions; but it cannot be preserved for review by being abstracted as a part of the record proper and brought up in an additional abstract.

2. SPECIFIC PERFORMANCE: Statute of Frauds. The Statute of Frauds will not be permitted to defeat an action where to apply it would be to work a fraud. But equity will not contravene the statute; it is founded upon it, and steps in only, by following well-defined exceptions to it, to fulfill it by discerning the large right of the transaction and to enforce the statute's purpose.

3. ———: Parol Agreement: Necessary Conditions. Relief by specific performance, being a matter of grace, will not be granted to enforce a parol agreement to make a will to devise (or to make a deed conveying) real estate except upon these conditions: 1st, the conversations relied upon as proof of the contract should not be too ancient, loose or casual; 2d, the contract should be fair and just, not an unconscionable bargain—regard being had to the condition in life of the parties; 3d, the terms of the contract should be so clear and definite as to free it from ambiguity; 4th, the proof should show that the very contract counted on in the bill was made; 5th, per-

formance must be shown, as far as practicable, and the acts relied on to show it must be unequivocal, that is, referable alone to the very contract sought to be performed; 6th, the contract must be grounded on an adequate and legal consideration, and it must be made clear that the law could not give adequate and perfect relief in damages; and, 7th, a mere testamentary disposition to devise by will, or a mere benevolent disposition to convey by deed, by way of gift or as a reward for services not plainly provoked by and bottomed on the contract in suit, will not take the case out of the statute.

4. ———: ———: ———: Extension of Exceptions. Beyond these rules and precedents, already established in the adjudications of this court, the courts will not go one step in upholding encroachments upon the Statute of Frauds.

5. ———: Possession: Tenancy. Possession plainly referable to a contract of lease and the relation of landlord and tenant, does not tend to establish a contract to devise or convey the land so occupied.

6. ———: Personal Services, rendered by plaintiff and his wife to decedent, in his extreme old age, long after the parol contract to convey or devise was made, and not then shown to be in contemplation, do not tend to establish the contract.

7. ———: Repairs and Improvements. Repairing fences, cutting weeds out of fence corners, hauling manure on the land, covering a barn and mending a porch to the dwelling, done by plaintiff, for many years the landowner's tenant, are more referable to a lease agreement than to a contract to devise or convey upon condition that the tenant would improve the place and keep it in repair; and there being no showing of the value of these labors, or that they were not paid for by the owner or that they were a definite part of the parol agreement (if there was one) to give the land to the tenant, he does not establish the contract by simply showing he did those things.

8. ———: Admissions. Statements made by the owner of land that he had promised to give his tenant another "place" if he would move from the one he was occupying, if they are just as referable to a promise to let him occupy a farm as tenant as to an agreement to give him the land outright, do not establish a parol agreement to devise or to convey.

9. ———: ———: Uncertainty: Effort to Sell. The fact that the owner offered to sell to another the land which his tenant says he had given to him, tends to show there was no abiding, certain and recognized contract existing between them that the place was to be given to the tenant.

10. ——: **Testamentary Disposition.** Plaintiff had for many years been the faithful farm tenant of decedent. who entertained and indicated a testamentary disposition towards him, and for whom he performed tender services during his last sickness for which the law would imply an obligation to recompense him, but his estate is solvent. Decedent was punctilious in all his business affairs, was importuned to make a will giving the land to plaintiff, but made none, and before his death stated he wanted plaintiff to remain on the place and pay rent to his widow, and he had lived on it and paid him crop rent for years. *Held*, that no parol agreement to devise or convey the land to plaintiff was shown, nor were the terms of the contract definite or certain, nor is there any reason for equity to interfere.

11. ——: **Witness: One Party Dead.** A plaintiff who sues to specifically enforce a parol agreement, with a deceased owner, to devise or convey land, is not a competent witness to prove either the contract or performance.

12. ——: ——: **Wife of Other Party.** Nor is the wife of such plaintiff competent to testify.

13. ——: ——: ——: **In Rebuttal.** Whether or not plaintiff in his suit to specifically enforce a parol agreement with a deceased landowner to devise or convey land to him, was competent to contradict the testimony of admissions made by him to witnesses for defendant, is not in the case, if he was not offered in rebuttal.

14. **ADMISSIONS OF PARTY.** There is no exception to the principle of law allowing admissions of a party to a suit, made against interest, to be used as evidence against him.

15. **COMPROMISE:** Testimony Wrongfully Admitted: Afterwards Excluded. The fact that the chancellor, in plaintiff's suit to specifically enforce a parol agreement with decedent to convey to him 120 acres of land, admitted testimony to the effect that plaintiff had said he would take forty acres and be satisfied, and did not exclude it until thirty days later when he came to decide the case, is not reversible error, if upon the whole case, whether such testimony were considered or not, there could be no decree for plaintiff.

Appeal from Lawrence Circuit Court.—*Hon. F. C. Johnston*, Judge.

AFFIRMED.

*McPherson & Hilpirt* and *Edw. J. White* for appellant.

(1) The defendant's answer pleading the Statute of Frauds to avoid the contract set up in the petition is an admission of the contract relied upon by the plaintiff, and the plea that decedent's estate is solvent, and plaintiff has an adequate legal remedy to recover for the services performed, is likewise an admission of the consideration for the contract alleged. Jones v. Rush, 156 Mo. 364; Cushing v. Powell, 130 Mo. App. 576. (2) The undisputed evidence establishing that the plaintiff had performed services sufficient, in the opinion of the owner, to vest him with the right and title to the eighty acres traded for the one hundred and twenty in controversy, and that the deceased, prior to his death had placed him in possession of the one hundred and twenty exchanged for the eighty, and acknowledged complete performance of his contract by the plaintiff, it would be a fraud upon the plaintiff to permit the defendants to retain the fruits of his years of toil, and deny him the enforcement of the contract which Sullivan in his lifetime admitted had been fully performed. Alexander v. Alexander, 150 Mo. 596; Berg v. Moreau, 199 Mo. 434; School District v. Holt, 226 Mo. 406; Brown v. Sebastapol, 153 Cal. 704; Hubbard v. Hubbard, 140 Mo. 300; Dozier v. Matson, 94 Mo. 332; Moss v. Culver, 64 Pa. St. 414; Johnson v. Johnson, 6 Watts (Pa.) 370. (3) The court erred in permitting the defendants to introduce illegal and incompetent evidence at the trial. (a) The evidence of what part of Sullivan's estate the plaintiff would be willing to accept without a lawsuit was evidence of a compromise and was clearly inadmissible. 1 Greenleaf, Ev., sec. 192; Rusher v. Aurora, 71 Mo. App. 424. (b) The statements and declarations of the plaintiff that he had rendered valuable services and expected to charge therefor if unable to hold the land, were also

inadmissible for the same reason and should have been excluded. (c) And the court's action in admitting such illegal and incompetent evidence, and considering the same for thirty days, along with the competent proof, and then attempting to exclude it before his finding for the defendant, is expressly condemned as reversible error in an equity case. Asbury v. Hicklin, 181 Mo. 670.

*McNatt & McNatt* for respondents.

(1) The contract pleaded being oral, is within the Statute of Frauds. Before a court of equity will enforce its performance, the proof must show beyond a reasonable doubt: "First. Not only that some contract existed, but that the precise contract in suit existed; second, the terms of the contract should be so clear and definite as to leave no doubt in intendment and certainty; third, performance on the part of the promisee should be shown, and that performance must be unequivocal and must in its own nature be referable to the very contract sought to be performed (whereby the party to be charged is benefited), that the conscience of the promisor and those claiming under him is bound; and, fourth, the acts relied on to show performance must point to the contract in suit and to none other." Kirk v. Middlebrook, 201 Mo. 245; Collins v. Harrell, 219 Mo. 279; Dawkins v. Griffin, 195 Mo. 430; Goodin v. Goodin, 172 Mo. 40; Rosenwald v. Middlebrook, 188 Mo. 58; Russell v. Sharp, 192 Mo. 270; Teery v. Craft, 87 S. W. (Tex.) 844. (2) The inconsistent allegations concerning the consideration of the contract in the original petition and the amended petition show that this is not a case that addressed itself to "the forum of conscience;" if the plaintiff could not state the contract when the original petition was filed, how can a court of equity find that a contract ever existed? Russell v. Sharp, 192 Mo. 270; Grantham v.

Gossett, 182 Mo. 651. (3) If the contract was as pleaded in the original petition, to-wit, deceased would convey the land to plaintiff, "if plaintiff would live upon and improve said tract of land," it states no consideration whatever moving to the deceased, and therefore cannot be enforced by a court of equity. Breavator v. Creech, 186 Mo. 558. (4) Where parties to a contract are old enough to take care of their own interests, are not ignorant, and know that the legal title to land can only be transferred by writing, the absence of such a writing is a circumstance calling for an explanation, and where no satisfactory explanation is given, as in this case, it is presumed no such contract was ever made. Russell v. Sharp, 192 Mo. 270. (5) The admissions of the plaintiff, in trying to buy a part of the land, and other acts disclaiming any ownership in the land, should preclude a recovery in this case. Rosenwald v. Middlebrook, 188 Mo. 58.

LAMM, P. J.—Specific performance—the land (the south half of the northwest quarter and the northwest quarter of the southwest quarter of section 15, township 26, range 25) lying in Lawrence county.

Joseph Sullivan died in March, 1907, full of years, intestate, seized of the land and a considerable estate besides, leaving a widow, Elizabeth, no children, and an only sister, together with the sons, daughters, grandsons and granddaughters of deceased brothers as collateral kin—all made parties defendant.

Elizabeth, electing to take half the estate subject to debts, under the statute, presently dies testate pending this appeal, making her foster daughter, Susan McKinley, sole devisee under her will, and nominating John F. McKinley, husband of Susan, executor. On suggestion here of the death of Elizabeth Sullivan, said McKinleys are by stipulation made parties, enter their appearance, and the cause stands revived.

In 1902 Joseph Sullivan purchased the land from one Stewart. For convenience let it be called the "Stewart Farm." There is another tract, often referred to, a mile or so from the Stewart farm. Let it be called "Neece eighty." On Joseph's death, plaintiff set up a claim to the Stewart farm, connecting that claim with a prior claim to the Neece eighty, contending that by agreement such prior claim had been transferred to the Stewart farm—the Neece eighty having been sold, he says, by Joseph, to one Seaman, and the Stewart farm purchased thereafter pursuant to such agreement. .

Presently, plaintiff sues for specific performance. Thereafter he files an amended bill, defendants answering and plaintiff replying to such answer. On a change of venue, the cause was tried by R. H. Davis, Esq., of the Lawrence bar, sitting as special judge. Cast below, plaintiff appeals.

I. Before reaching the merits, there is a preliminary question inviting disposition, viz.: Plaintiff (as is proper, Rule 9, *q. v.*) abstracts only the amended bill. Defendants file an additional abstract purporting to bring here the original bill. Thereby showing further that they objected to testimony under the amended bill on the grounds (among others) of a departure, in that it made additional and different vital averments not in the first bill, that their objection was overruled, they excepting. Pointing us to that objection, exception and to the original bill, so abstracted by them, they seek, *arguendo,* to have us compare the original with the amended bill in order to show that the contract to be specifically performed, pleaded in the one, differs in material particulars from that in the other. On such premise, they press upon us the contention that plaintiff "had no certain or definite contract that he knew of himself," and, after consulting with his witnesses, amended his pleading to conform to their testimony.

The point lacks substance. Because: By answering over to the amended bill they waived the departure, as a departure. [Walker v. Railroad, 193 Mo. 1. c. 472; Liese v. Meyer, 143 Mo. 547.] They had a last shot left in their locker on that score, viz., the right to introduce the abandoned bill as evidence, as an admission by plaintiff against his interest. [Meriwether v. Knapp, 224 Mo. 1. c. 627, and cases cited; Anderson v. McPike, 86 Mo. 293; Schad v. Sharp, 95 Mo. 573.] But they did not use it by putting it in evidence. It nowhere appears in the bill of exceptions as an evidentiary fact, where alone it could be so preserved for appellate use. Dead as a *pleading,* it could spring to life as *evidence* in no other way. [Missouri Pacific Railway Co. v. Bank, 212 Mo. 1. c. 517; Rule 9, supra.] Therefore we may not consider it on the merits of the case.

II. The contract and the grounds upon which it is sought to be enforced are set forth in the amended bill to be that for many years plaintiff had been living upon tracts of land belonging to Joseph Sullivan and for that period (quoting) "had rendered various and valuable services to said deceased, in the way of clearing and improving said different tracts of land, for said deceased, in selling and disposing of the different kinds of products raised on said tracts of land and caring for and rendering other personal services to said deceased, and the plaintiff has never been paid any sum whatever for any of such services so performed for said deceased. That all such services were rendered under and in pursuance of a verbal contract and promise, on the part of said deceased Joseph Sullivan, that he would convey the legal title to the tract of land on which he then resided to the plaintiff, before the death of him the said Jos. Sullivan."

Referring to the Neece eighty, its sale, the purchase of the Stewart farm and the alleged contract pertaining to both, the bill states that plaintiff resided

on and improved the Neece eighty, and that (quoting) "the sole consideration for all such services so rendered to said deceased, was the repeated promise, on the part of said deceased that he would see to it that the plaintiff was made the legal owner of said eighty-acre tract of land. That instead of deeding said eighty-acre tract of land to the plaintiff, as said deceased repeatedly agreed to do, in payment for all said services so rendered him by the plaintiff, during the year 190— said deceased, with the consent of plaintiff, sold and conveyed said eighty-acre tract of land, on which the plaintiff then resided, and in lieu thereof, purchased the above described one-hundred-and-twenty-acre tract of land [which] the said deceased Jos. Sullivan then and there promised and agreed, in consideration of all said services so rendered by the plaintiff and those to be rendered by the plaintiff, to deed or cause to be deeded or conveyed to the plaintiff."

. It is next alleged that at an unnamed date Joseph Sullivan put plaintiff in exclusive possession of the Stewart farm and "then and there agreed and promised" that if plaintiff "would live upon and improve said one-hundred-and-twenty-acre tract of land and continue to render such personal and other services to the said deceased, Jos. Sullivan, he would convey the legal title to said one-hundred-and-twenty-acre tract of land to the plaintiff, before the death of him, the said Jos. Sullivan."

It is next alleged that in pursuance of the contract plaintiff moved on the Stewart farm, took possession, "made lasting, permanent and valuable improvements, rendered various and valuable personal services and other services and labor and expended money and labor in improving" it, all with Sullivan's knowledge and consent, who received such "labor, services and expenditures" knowing that plaintiff relied upon a performance of the contract in Sullivan's lifetime.

That he neglected to convey to plaintiff as agreed, and since defendants, his heirs-at-law, have likewise refused, plaintiff prays for specific performance, etc.

Admitting Joseph Sullivan's and defendants' legal title, the answer denies plaintiff has any title, or that Joseph intended to give, or convey the land to him; avers that all the possession plaintiff ever had was as Joseph's tenant, attorning to him by paying rent; that plaintiff having taken and held as tenant is estopped to claim possession otherwise; that defendants now have possession of a certain thirty acres of said Stewart farm through their tenant, Hemphill, to whom Joseph rented in his lifetime. Denying each and every other allegation, the answer avers that, if plaintiff performed any services for deceased for which he has not been fully paid, Joseph's estate is solvent and in the course of administration, wherefore he has a full and adequate remedy at law. There is also a plea of the Statute of Frauds in bar.

The reply was conventional.

On pleadings thus outlined there was a long trial and much evidence. We shall not swell this opinion with all the details. It appears without contradiction that plaintiff is past middle age; that he is a poor man, had been a faithful and trusted friend and tenant of Joseph Sullivan for, say, twenty or more years, first on the Neece eighty and then on the Stewart farm; that he worked as a farm hand for Sullivan prior to his marriage, and married Mrs. Sullivan's housemaid; that both of them were worthy people, receiving the long continued and entire respect and good-will of Joseph Sullivan; that after the marriage they resided with the Sullivans on the Neece eighty for awhile, Joseph then buying another tract and moving there, leaving plaintiff in possession as tenant. The precise terms of this tenancy or the terms of plaintiff's lease on the Stewart farm are not disclosed, other than that he paid one-third rent in kind; whether in the crib, bin

or mow on the place or at Sullivan's residence is not as clear as it might be. The Sullivans were childless, lived plainly, without jar or discord as husband and wife, and towards the end became feeble—Joseph having an obstinate sore on his hand, and was bothered by other afflictions attending old age. When Sullivan moved from the Neece eighty, as we grasp it, say eighteen years prior to his death, he lived a mile or two away from plaintiff and a little the rise of that from him when the latter moved to the Stewart farm. It is conceded that Sullivan died intestate, leaving no children and seized of a large estate; that Elizabeth was his widow, and the other defendants his heirs-at-law. He was a hard-headed, practical man, shrewd and rather close in money matters, a stickler for his rights in business dickering, inclined to accumulate property and setting store by it; honest withal, and prompt in paying his debts. The record is dark on the value of the Neece eighty or of the Stewart farm. At a certain time, say, five or six years before he died, Sullivan sold the Neece eighty. It is not quite clear when he bought the Stewart farm, but it was either a little before or a little after the sale of the Neece eighty, and, on surrendering possession to Mr. Seaman, the purchaser, Forrister was put in possession of all or the greater part of the Stewart farm as tenant of Sullivan and remained there until Sullivan died.

Assuming the facts heretofore narrated as true, we come to a set of facts either affirmed on one side and denied on the other, or from which different conclusions are drawn by learned counsel.

On behalf of plaintiff a witness, Mr. Smith, testified that after Sullivan bought the Stewart farm he met him in a buggy hard by a graveyard. The two were old friends and Sullivan was on the road to the Neece eighty. After the talk ran on a little, Sullivan mentioned that there was some misunderstanding over getting possession of the Stewart farm and he wanted

Forrister to move as quick as he could. Witness said to Sullivan: "Mrs. Forrister once told me that place (the Neece eighty) was theirs." Then Sullivan: "That is the truth, I did aim for Jim Forrister to have this place; I promised it to him, but I bought him a better place; he says, I have got him a good place now. Yes, I says, you did; he says, I am going to get him over there. I am going to give him that place instead of this one, he says there is too much poor land on this place, he has worked long years for me and worked well. I want to have him a good place. I said, Uncle Joe, don't you think you ought to make a will, if Jim shall have that place? Well, he said, no, I am not going to make any will; you know I haven't any children of my own, and I have enough left besides that place for my kin folks to have a fight over. Of course, I says, I guess they will have a fight; then he says, Let them fight it out. That is about all." There was nothing said about when the promise was made. Further pressed by questions, it came out that Sullivan said plaintiff had "worked long years" for him "here" and "done    hard work for me and he didn't get anything out of it; he wanted him to have a better place and he just thought he would sell this place and let him have that place and he said they was willing, he had spoken to them and they was willing"—meaning thereby plaintiff and his wife. Witness has seen plaintiff tearing down an old barn and rebuilding it, improving the fences, making new rails and fixing up the house on the Neece eighty. He got cherry trees from witness and repaired the house and when he moved to the Stewart farm he took up the cherry trees and some strawberry vines and plants and carried them over there. On cross-examination it appeared he did not know whether plaintiff paid for the material used in repairing the house and barn on the Neece eighty or not, but he knew he improved the eighty by repairing the barn, house and fences. It was in a better condi-

tion when he moved away than when he went there. He did not know whether Sullivan paid plaintiff for his work.

By another witness, a daughter, nineteen years of age, born on the Neece eighty, plaintiff showed that he had moved some fruit trees and shrubs from the Neece eighty to the Stewart farm when he moved, this at the suggestion of Mr. Sullivan. Asked what he said about moving the plants and trees, her reply was: "A. He came up to our house and said, Jim, I have come to tell you I am on a trade with Mr. Stewart for the Stewart place; he said, if you are willing I will buy the Stewart place for you and you can move down there, he said; you know according to our contract, you are to keep up the place for the place, and says, the place is yours and you can take your shrubbery and your fruit trees and everything and put them out down there; and, he says, the place is yours."

In testifying to the character of the work done by her father on the Neece eighty, she said, "He kept up the place, kept the fence corners cleaned out, such as that," and kept up the fences. The court asked her how many peach and cherry trees were transplanted, and she replied she did not know exactly, she had no idea, but there were "several." She did not know how long these trees had been planted before removal, but other evidence showed a few young cherry trees and some strawberry, flowering and rhubarb plants were carried over. Her father built fences, hauled rocks and manure and repaired a front porch on the Stewart farm. Speaking of services rendered by her father to Mr. Sullivan, she said her father and mother waited on him when he was sick ever since she could remember, his last sickness covered about eighteen months; they "sat up" and waited on him. Mr. Sullivan had a sore hand and her mother dressed it four or five times a week—every time Mr. Sullivan came over to their house or she went over to his; her mother was called

over there for that purpose; her father sat up with Mr. Sullivan during his last sickness, lifted him up and down and cared for him and used a syringe to move his bowels. At a certain time in November, 1906, Mr. Sullivan was at plaintiff's house and the daughter heard him say this to her father: "Jim, I have come up to turn the place over to you to run; he said, it is yours; he said, according to our contract you have more than earned it, he said it is yours, he said I don't want you to let Joe Jesse have any ground, he won't gather my rent and I know he won't gather yours." Inquired of, on cross-examination, it appeared that a nephew of Mr. Sullivan, "Joe Jesse," had helped build the porch and that her father had told her that he paid Joe Jesse for his help. Mr. Sullivan bought the boards to cover the barn on the Stewart farm and told her father that Joe Jesse owed him seventy-five dollars and that if her father could get him to help, he, Sullivan, would pay that much. Joe Jesse did help in covering the barn. She did not see her father pay for the boards to cover the porch, but her father told her he paid for them. During all the time her father was on the Neece eighty and the Stewart farm he paid Mr. Sullivan one-third he raised as rent and delivered it. The rent for the year (1906-7) had been paid before the last conversation. Asked about Mr. Hemphill's cultivating thirty acres of the land, she said Hemphill rented it from her father. She knew this because her father told her so. A boy named White was with Mr. Sullivan at the time he had said conversation with her father. (Note: This boy was living within reach of a subpoena, but was not introduced by either side; his mother, however, testified for plaintiff.) After Mr. Sullivan got so bad during his last sickness, other neighbors commenced coming in to wait on him, but her father sat up most of the time. Sullivan had a Mrs. White and a Mr. Lee there part of the time. Her father did the usual work at home looking after things

before going over, and Mr. Feester lived on Mr. Sullivan's farm and at times took care of him. A Mr. Lee helped take care of the old gentleman, and Joe Jesse, but not often. Mrs. White did the work in the kitchen and Mr. Lee brought in wood, made fires and helped wait on Mr. Sullivan.

Another witness, Mr. William Rea, testified to a conversation had with Mr. Sullivan in which he wanted to buy the Stewart land from Mr. Sullivan and it was priced to him at fifty dollars an acre. We quote some of this testimony: "Q. What did he say and what did you say? A. I stopped and got out of my buggy; I asked him, I wanted to buy that place he bought from Stewart; he says to me, he called me Will, he says Will, that place is not for sale; he says, I bought that place for Forrister to work; then went on and said, if I was to price it it would be so high you could not buy it. I wanted to know what his price was on the place, so I asked him the question; I said, well, price the place to me."

Plaintiff's brother testified he lived for a year with him fourteen years ago. Before he got married, he asked his brother if he could live with him in the house and plaintiff told him to "name it to" Mr. Sullivan. He did and the latter told him it was "nothing to him." "It is Jim's place and he can do as he pleases. I promised that to Jim for what he has done." Speaking of repairs he was cognizant of at that time on the Neece eighty, he said plaintiff repaired the fences, hauled manure and did about a week's work on the wall about the well, so that when big rains came they would not wash in. He cleaned out fence corners, sharpened posts and made a few rails. He also sold Sullivan's corn, cribbed on the place, to miners on Sunday. He did not know of his being paid for this work. He never saw Mr. Sullivan give plaintiff any money. Plaintiff covered the barn on the Stewart farm and the east porch of the house. He got "Joe Jesse" (Sullivan) to

do that and paid him in seed corn. He knew plaintiff paid him because he heard Joe Jesse say, "I will make as long a job as I can so I will get enough seed corn." A Mr. Ragsdale built a fence on the Stewart farm and plaintiff paid him. It seems from the cross-examination that the wire for the fence was on hand but no posts; that plaintiff sold Sullivan's rent corn, in lieu of hauling it to Mr. Sullivan's house; and that at one time plaintiff bought some clover and timothy seed and sowed on the place.

Enoch Medlin, seventy years old, who described himself as "very forgetful," testified for plaintiff that on an evening's visit to Mr. Sullivan during his last sickness a conversation occurred. Let it be told in the witnesses own words, viz.: "I was over there one evening. He just ask me, says he, How did you fix up your business, Enoch; I understood you got your business fixed up. I said yes. Says he, How did you fix it? Says I, I gave one forty acres I live on to my son to take care of his mother and me and the other land I divided between the other children. Says he, I believe that is all right, I believe that is a good policy; I don't know as he said policy, he said I believe that is all right. I says to him, says I, Mr. Jim Forrister has been good to you, Uncle Joe, and it is time you are doing something for him. I think something to that amount. Says he, yes, Jim has been good to me for twenty years waiting on me and doing for me and says he, I am going to do something for Jim. I aim for him to have that land he lives on, that is about what he said." From his cross-examination it appears this conversation was about three months before Mr. Sullivan died. Mrs. White and her daughter might have been in the room so far as witness knew. He did not recollect Mr. Sullivan's saying "the place is mine and I am going to keep it." On an inquiry from the court as to what he did say, his answer was, "He said he was going to do something for Forrister. Q. Did he say

what he was going to do? A. No, only he said he aimed for Jim Forrister to have that land he lived on, that is about the way he spoke it.'' Witness had given his deposition in the case and admitted that in that deposition he might have said that he spoke to Jim Forrister about Mr. Sullivan giving him something and might have said that Forrister had said, ''Uncle Joe ought to give me something for waiting on him and doing work for him.'' He reiterated that he had a poor memory and couldn't recollect much about what was said, but he did recollect that he had a talk with Mr. Forrister in which he said, ''Uncle Joe (meaning Sullivan) ought to allow him something for waiting on him—ought to do something for him. I can't tell much about it; it has done passed my recollection.''

From Mrs. Flora White plaintiff elicited testimony that she had spent several weeks at Mr. Sullivan's home during his last illness, was present when Enoch Medlin was there, but heard no conversation. A short time before death, Mr. Sullivan was raised up in bed and talked in the presence of witness, Mr. and Mrs. McKinley and Mr. Forrister. She couldn't remember all said, but recalled one remark, viz., ''he wanted Jim Forrister to stay right where he was on the place.'' She testified to Mr. Forrister's coming over and helping take care of Mr. Sullivan quite often, and giving him injections, sometimes he was sent for to do that. On cross-examination she testified that Mr. Sullivan said, in the death-bed conversation, that he wanted ''Mr. Feester (his tenant on his home place) to stay right where he was.'' Asked if he didn't say that he wanted them to pay ''Aunt Liz rent,'' in the same conversation, she replied: ''Something said, I don't know how it was, I got it mixed up.'' She was then asked this question: ''Aunt Liz, his wife, was to be paid rent?'' Her answer was: ''Something to that amount—I would not swear to what it was.'' He was telling John McKinley ''how he wanted his property and what he

wanted done with his stuff.'' She gave evidence tending to show that the McKinleys and some of the Sullivans helped take care of Mr. Sullivan and that some of them were absent in Texas during his last sickness, that plaintiff lived closer than any of the Sullivans, that Mr. Lee lived with Mr. Sullivan part of the time and waited on him, that she had a son fourteen years old who lived there while she did, that this son went with Mr. Sullivan over to plaintiff's house on several occasions. Witness dressed Mr. Sullivan's hand part of the time, and Mrs. Forrister dressed it, for a running sore. Plaintiff also helped take care of him. She never saw him paid for what he did. Mr. Sullivan had plenty of money to hire help and always paid witness. Recurring again to what Mr. Sullivan said on his death-bed, witness said he spoke of both Feester and Forrister at about the same time staying where they were and paying rent, but she could not swear exactly how it was as she "got it mixed up." A Miss Hemphill stayed there some and dressed Mr. Sullivan's hand, also a Miss Griffin.

A Mr. Gree testified he was present in a store and heard Mr. Sullivan talking a year or so before he died, to the proprietor of the store. Rucker, the proprietor, asked Mr. Sullivan why "he didn't have his business fixed up" and Sullivan told him he "had it already fixed." "He said he intended for Jim to have the 120 acres he was living on . . . but he didn't intend that the Sullivans should have any." He told what he wanted the McKinley children to have and said that was the way "he aimed to handle it." On cross-examination it was shown that this witness was keeping company with plaintiff's daughter, that he had told one of plaintiff's attorneys about overhearing the conversation between Sullivan and Rucker about three weeks before the trial and no one else.

A Mr. Forrister, of distant kin to plaintiff, gave testimony to the effect that he had seen plaintiff cut

fence corners and build a fence on the Neece eighty, had seen him make rails there and build new fences, cover the barn. Witness and a brother helped cover the barn and received their pay in the use of the barn to "shed" a machine during one winter. On cross-examination witness admitted he did not know what the understanding was between Mr. Sullivan and plaintiff about getting pay for his work, and that he did not know at that time of plaintiff making any claim on the place. Plaintiff had cleared "some little patches there," but he did not know how much.

Another witness—a brother of the last—testified that he saw plaintiff cut fence corners and haul manure, build some new fences and repair the barn on the Neece eighty, had helped him do it. In covering the barn his brother and Joe Jesse Sullivan helped. On the Stewart farm plaintiff had built a porch over the east door. He had seen him measuring out Sullivan's corn for several years and selling it, but did not know whether he was paid for it, never saw him paid. On cross-examination it appeared that the porch was an old porch about eight by twelve, covered with boards. Witness did not know who furnished the boards The corn plaintiff measured out was in a crib on the Neece place. Witness had rented the south thirty acres of the Stewart place a year or so before and paid rent to Mr. Sullivan, had spoken to plaintiff about renting it and he had agreed to it.

By a Mr. Stafford plaintiff showed that he once owned the Neece eighty and about twenty years before sold it to Mr. Sullivan, Sullivan moved on it, afterwards bought a farm from Mr. Kingery and moved there, where he died, then Mr. Forrister went on the land. About five or six years ago Mr. Sullivan sold the Neece eighty and bought the Stewart farm. At that time witness had some negotiations with Stewart about buying the farm himself, and after Sullivan bought it he asked him what he would take to sell it to him. Mr.

Sullivan said: "He didn't want to sell the farm, that he had sold the other farm and Jim had moved over there and he was keeping the farm for Jim, and he didn't want to sell it to me on account of Jim keeping it."

Such is plaintiff's case on the facts.

A Mr. Charles Stewart was put on the stand by defendants. One of his sisters had married a Sullivan, an heir to the Sullivan estate. This witness testified to a conversation with plaintiff, shortly after Mr. Sullivan's death, in which plaintiff said that Mr. Sullivan "hadn't given it to him nor promised it to him, but had talked like he would do something for him, but had never promised it to him." Witness was a son of the Stewart who once owned the farm. He saw the place every few days and noticed no improvements after plaintiff went there. Plaintiff told him, after Mr. Sullivan's death, that he, plaintiff, had tried to buy five acres of the land from Mr. Sullivan, but the latter had said "he didn't want his land cut up that way." On cross-examination, witness said there was a good porch on the house when it was sold to Mr. Sullivan and he had not seen a new porch put on since, that there was a board roof put on the barn, he had seen some new fence built this spring since the suit, and some new posts scattered along the road, had seen some fence corners cleaned out and some weeds and brush, about a half a quarter, in one place.

By a Mr. Hemphill it was shown that he was occupying the south thirty acres of the Stewart farm, as tenant. He had talked to plaintiff about renting it. He sent him to see Mr. Sullivan and witness made the arrangement with him. Sullivan told him to put it in corn. Plaintiff told him before that he could have it "so far as he was concerned," and sent him to see Mr. Sullivan.

By a Mr. Feester it was shown that he was a tenant on the home place of Mr. Sullivan's, that Forrister

had paid rent for the Stewart place for the last year, had hauled corn to Sullivan's place and wheat to Aurora. At a certain time last spring, when witness, plaintiff and McKinley were killing hogs for Mr. Sullivan, plaintiff said that when he and Mr. Sullivan were going to Marionville the other day, he tried to buy five acres of land of him and Mr. Sullivan had refused to sell it.

By Joe Jesse Sullivan it was shown that he was fifty-one years of age, he had assisted plaintiff in putting a roof on the barn of the Stewart farm, he was working for Mr. Sullivan and was paid by him. He had a conversation with plaintiff during January or February last spring. They were talking about "the shape" of Mr. Sullivan's affairs, he was sick and his affairs were neighborhood talk, they talked about whether there was a will and plaintiff said that if there was one he knew nothing about it and didn't believe anyone else knew anything about his business, he had the price to buy five or six acres of land off the place where he lived and Mr. Sullivan had told him he didn't want to sell it because it would injure the sale of the place. The rest of his testimony tended to show that witness had helped take care of Mr. Sullivan in his last sickness, had been there with plaintiff and that the improvements put by plaintiff on the land he had cultivated didn't amount to much. The old barn was about as bad as being "out of doors," but once in a while a little patch was fenced off. He was a brother-in-law of plaintiff and visited there frequently. He knew of no permanent improvements plaintiff put on the Stewart farm. On cross-examination he admitted that he owed the estate fifty dollars, he didn't know how long. Plaintiff had asked him to help cover the barn and Mr. Sullivan had credited his note for his work. He knew of plaintiff's waiting on Mr. Sullivan and plaintiff had told him Mr. Sullivan was not paying him for it. He mentioned others who gave injections to

Mr. Sullivan. Plaintiff and he had talked about Mr. Sullivan being nearly dead, that he had no will and it looked as if "he ought to do something about it," or it would go "helter skelter everywhere." Witness is the son of the only surviving sister of Mr. Sullivan and had taken some interest in the defense of the suit at the request of his mother and father. Mr. Sullivan had paid him for his work on the barn. He got seed corn from plaintiff but his uncle had paid for it. There was about two hundred feet of lumber in the porch, worth about $1.75 or $2 per hundred. The cost of the porch at the rate this witness figures it, as near as we can make out, would be from ten to fifteen dollars.

Miss White, a daughter of Mrs. Flora White, testifying for defendants, said she heard part of the conversation between Mr. Sullivan and Enoch Medlin, testified to by the latter. She heard Mr. Sullivan say to Mr. Medlin, referring to the "place," that "it was his and he was going to keep it." On cross-examination she said Mr. Sullivan didn't exactly say what place, she didn't know if he was talking about the Stewart place, but she heard him say "I own this place." He was at his own home at the time. She didn't know if he referred to the home place and she didn't know what place it was.

Mr. Payne testified that while Mr. Sullivan was in his last sickness plaintiff had told him (Payne) that he had offered Mr. Sullivan $50 per acre for five acres of the land about the house where he, plaintiff, lived, and Mr. Sullivan had told him, plaintiff, in reply to that offer that he didn't want to sell it. "It would ruin his place." Further, plaintiff told him he was keeping track of each night he sat up and every time he used the syringe on Mr. Sullivan, and that if Mr. Sullivan "didn't give him nothing he was going to charge him for it." This talk was in Mr. Sullivan's house while he was asleep. On cross-examination it appeared that plaintiff did not tell witness "Mr. Sullivan had prom-

ised him the land." Witness is a son-in-law of John McKinley and had a misunderstanding with Mr. Sullivan, had lived with him and had left, but had come back and sat up with him. Plaintiff said he was counting on Mr. Sullivan giving him part of the estate. If he gave him any he would not charge him, if he didn't he would.

By a Mr. Hemphill defendants proved that plaintiff said that he had made fifty-nine trips in taking care of Mr. Sullivan and he was going to charge for it. This was during his last sickness. Plaintiff did not claim to him that he had a contract with reference to the place he was living on.

By Mr. Kingery it was shown that about a week before Mr. Sullivan died plaintiff told him about some person that had waited on a sick woman in Marionville, and her administrator had allowed her for her services and that he, plaintiff, ought to get the same. On cross-examination the witness admitted that plaintiff took care of Mr. Sullivan "off and on" during his illness, and said again he had not told him that he had any understanding with Mr. Sullivan, had not told him that he had consulted with counsel and that if he couldn't enforce the contract he would require pay for his work, told him nothing about improvements on the Stewart farm or on the Neece eighty, did not say he was trying to get any land.

The former owner of the Stewart farm was put on the stand. He testified that he noticed some little improvements since he sold it, the barn had been re-covered. On the Neece eighty while plaintiff was there, he had a talk with him about cleaning out a fence row and plaintiff said Mr. Sullivan paid him for it. He knew of some work on a line fence on the Stewart place, but he hadn't noticed the porch. There was a porch there when he sold the farm. The ends of the plank were rotten. He had noticed a new roof on the barn, had never heard plaintiff claim the land. Witness's son had

married one of the heirs of the Sullivan estate and his daughter another.

Marshall Avery testified for defendants that plaintiff told him that while on a trip to Marionville with Mr. Sullivan, he, plaintiff, had said to Sullivan: "If he was going to give him anything that would be the best time to do it," and Mr. Sullivan had replied, "the best thing he could do was to keep still." Plaintiff told this to witness the night Mr. Sullivan died. On cross-examination it appeared that Forrister had not told witness, a son-in-law of Mr. McKinley, that Sullivan had agreed to give him the farm.

Sarah Medlin testified for defendants. She is a daughter-in-law of Enoch Medlin (witness for plaintiff). In a conversation with plaintiff, with whom she was very friendly and of whom she spoke as "Uncle Jim," he told her that Mr. Sullivan was pretty bad, didn't think he would live long. Witness asked if he had not made a will. Plaintiff replied, no. Witness asked, do you think he will? Plaintiff said, "No, he won't, he likes money too well to ever do anything." He said: "I have done more for him than all the Sullivans together, and I won't get anything." I said, "Uncle Jim, I would book everything I did." After Mr. Sullivan's death plaintiff told witness there had been a will, it had been made and was destroyed. On cross-examination she said plaintiff had not told her that Mr. Sullivan had agreed to leave the place where he lived to him. She had told plaintiff "the law was a bad thing," and he had said to her, "yes, and it would not give him nothing." In her cross-examination she again said she had told him "law was a bad thing" and he had replied, "he expected that, but the enforcement of his rights would not cost him anything." Witness knew plaintiff expected to be a beneficiary of Mr. Sullivan's will—that Forrister thought so. He said Mr. Sullivan "had promised him something—promised to do something for him."

Mr. Seaman, who bought the Neece farm, gave testimony for defendants that when he bought it the buildings were not in good repair, they were getting old and considerably rotten and the fences were in poor condition, on one side the fence rows had been partly cut out, he knew nothing of trees having been taken up and moved to the Stewart place. Witness was cashier of a bank in Marionville where Mr. Sullivan kept an account and plaintiff was frequently with Mr. Sullivan, he seemed to think a good deal of him. He came with Mr. Sullivan to the bank more often than anyone else. On cross-examination it further appeared that Mr. Sullivan never told witness that he had a contract with plaintiff to give him the land, witness did not know that Mr. Sullivan got plaintiff's consent before he sold the Neece eighty. On the day witness was going to see Mr. Sullivan, he talked with plaintiff (we assume he passed by the Neece eighty in going to Mr. Sullivan's), told plaintiff he wanted to buy the place and the price he was willing to give. He then went on to Mr. Sullivan's and told him what he had said to plaintiff. He asked plaintiff about the condition of the land, the average of the crops per acre and when he could get possession. Afterwards, his recollection was that he narrated to Sullivan the prior talk had with plaintiff. Sullivan accepted his offer the same day it was made, and his offer was substantially that talked over with plaintiff. He had not tried to buy the place from plaintiff. Plaintiff made no claim to it to him, said nothing about having any interest in it. The reason witness talked to plaintiff was that he was the tenant and he thought he ought to see him.

To further sustain the issues on their behalf the defendants introduced Mr. McKinley. By him it was shown that he had helped Mr. Sullivan in transacting business when asked to. He frequently consulted him about writing, but did not consult him in a financial

way, for Sullivan's judgment was the best of the two. After Mr. Sullivan's death he heard a conversation between plaintiff and Mrs. McKinley. She asked plaintiff what he would take to be satisfied and he replied he would take forty acres. This testimony was objected to as an effort to compromise and was stricken out by the court, after taking time to consider, and when judgment was about to be pronounced.

Defendants also offered proof showing that Mr. Sullivan paid all taxes against the Neece eighty and the Stewart farm for the years he owned them severally.

There are assignments of error on rulings on testimony. Facts pertaining thereto will appear presently with the determination of such assignments.

Such is the whole case. We have stated the facts at length, being of the opinion that to state them is to decide the case—the principles of law controlling cases like this being writ so large that even he who runs may read.

"I prefer to stand," says WHELPLEY, J., "in the administration of the law of real estate, *super antiquas vias, stare decisis.*" [Adams v. Ross, 30 N. J. L. 1. c. 513.]

It is old and seasoned learning that, as the laws of men presumably are founded on natural justice and reason, courts search as with a lighted candle for the reason of the law, and, when found, put it as part of the law itself. Mindful to that end, the underlying reason of the main exception to the Statute of Frauds (an exception invoked by plaintiff and upon which he must stand or fall) is universally allowed to be that a statute leveled against fraud ought not to apply to a case where to apply it would work a fraud—thus accomplishing judicially the shameful thing the law was intended to prevent others from accomplishing. If the law were made to fill that bad office, because of courts sticking in the bark, it might be likened unto that anomalous person of whom it was spoken:

"His honor, rooted in dishonor, stood;
   And faith, unfaithful, kept him falsely true."

To avoid such abhorrent result, equity steps in (not to destroy the law, but) to fulfill the law by discerning the soul of it and enforcing its purpose.

In expounding the Statute of Frauds stress is frequently laid on its office in shutting the door to the danger of perjury in suits to perform parol land contracts in specie. But, peradventure, the intendment of the statute goes further, connecting itself with mere frailties of memory. It shuts the door to danger on that side. Doubtless one or another of the reasons and causes of the Statute of Frauds may be traced to the ideas and customs of ancient peoples. As far back as the trained eye of the student may penetrate the dimness which time spreads like a mist over the past, it would seem that mankind with one accord have been fond of visible tokens, signs and memorials exciting the memory and perpetuating evidence of contracts and covenants.     When the Persian, demanding earth and water as a palpable token of tribute from the Greek, sent his servants for the same, the Greek impliedly recognized the custom while grimly denying its application to the specific case then in hand. Much to the amusement of the world ever since, he, long on accommodation but short on manners and hospitality, hustled them down a well and told them to get their earth and water there. So, In re Ruth, Boaz et al., are we not told by unquestioned and venerable authority as follows: Now this was the manner in former times in Israel concerning redeeming and changing, for to confirm all things; a man plucked off his shoe, and gave it to his neighbor; and this was a testimony in Israel? In and about that pleasant and notable contractual arrangement, did not Boaz take off his shoe as evidence? Did not Jacob take a stone and set it up for a pillar for a witness between Laban and him, commemorative of a domestic contract doubtless familiar to the whole bar

of Missouri? If there be need for further authorities in point, was not a sacred covenant, on which our Father Abraham set store, perpetually commemorated by the command: Every man child among you shall be circumcised . . . and it shall be a token of the covenant between me and you? For what tremendous purpose, withal, was the bow set in the clouds if not as a token of a mighty covenant? The record runs: And it shall come to pass, when I bring a cloud over the earth, that the bow shall be seen in the cloud; and I will remember my covenant, which is between me and you and every living creature of all flesh; that the waters shall no more become a flood to destroy all flesh . . . and I will look upon it, that I may remember the everlasting covenant, etc. Pursuing a little further the theme by fortifying the idea by less noble precedents, what was the delivery of a key, a twig or a clod in the livery of seisin of the old common law but a recognition by common consent of the use of a visible token in commemorating a contractual change of title to property? What else is an engagement ring but a visible token of a contract to marry between a youth and a maid? So, the grasp and shake of the right hand is as old as written language, as a token of a renewed covenant of friendship. Did not Jehonadab give his hand to Jehu? And, reminiscent, do not we all know that Nestor shook hands with Ulysses on his return to the Grecian camp with the stolen horses of Rhesus? That Aeneas shook hands in the temple of Dido with his sometime lost companions. And Horace, taking his morning stroll along the *Via Sacra,* did he not shake hands with passing acquaintances? In some other old book, in some idle moment, I have read of a custom among Parthians and Persians to shake hands in token of a contract. They bargained by the shake of the hand, *sub manu congruere*—esteeming the joining of the right hand a most inviolable obligation to fidelity—a custom not yet lost forsooth.

But we have been led afield in possibly unprofitable speculation. To come closer to the mark, the Statute of Frauds stands, whatever the reason of its enactment, a perpetual and impassable barrier to the specific performance of parol contracts relating to the sale and transfer of real estate, except a plaintiff bring himself precisely within the rigid and well-marked limits of the channel of the main exception allowed by equity. The statute is always a defense, unless that exception arises —an exception to be enforced only in a court of conscience. Now, conscience, as spoken of in the law, does not administer the statute by the varying, springing whims and caprices or the unregulated discretion of the individual chancellor in each particular case. Conscience is administered by fixed principles. It is founded on the law and never contravenes it. [Johnson v. Railroad, 227 Mo. 1. c. 450.] Relief by specific performance being somewhat of grace, equity has settled the rules for granting such relief in this class of cases to be that a parol contract to make a will to devise (or to make a deed conveying) real estate will not be enforced in specie except on certain high and stringent conditions —each a *sine qua non*, viz.:

(a). The conversations relied on as proof of the contract should not be too ancient, loose and casual.

(b). The contract should be fair and just, not a fetching, biting or otherwise unconscionable bargain— regard being had to the condition in life of the parties.

(c). The terms of the contract should be so clear and definite as to free it from ambiguity and leave no doubt in certainty of terms or intendment.

(d). The proof must show not only that *some* contract was made, but that the contract counted on in the bill was made.

(e). Performance must be shown as far as practicable. It must be unequivocal. The acts relied on to show performance must in their nature be referable alone to the very contract sought to be performed; for

it is only thereby, because of the benefits arising to the promisee, that his conscience and that of those claiming under him are bound. In a word, the acts relied on to show performance must point unerringly to the contract in suit and to none other. There must be an absence of doubt or equivocation throughout the whole case in pleadings and proof. From end to end it must be made out beyond a reasonable doubt and the state of the proof must bring the case within the reason of the exception to the statute, viz., that not to perform in kind, or in sort, would itself be a fraud.

(f). The contract must be grounded on an adequate and legal consideration and it should be made clear to the mind of the chancellor that the law could not give adequate and perfect relief in damages, thereby attaining the full end and justice of the case and reaching the whole mischief; hence, the interference of equity is necessary to do rounded justice.

(g). A mere testamentary disposition to devise by will or a mere benevolent disposition to convey by deed, by way of gift or as a reward for services not plainly provoked by and bottomed on the contract in suit, will not take the case out of the statute.

The foregoing rules are deduced from a line of late cases, for example: Russell v. Sharp, 192 Mo. l. c. 285, *et seq.;* Collins v. Harrell, 219 Mo. l. c. 300, *et seq.;* Kirk v. Middlebrook, 201 Mo. l. c. 289, *et seq.;* Berg v. Moreau, 199 Mo. l. c. 433, *et seq.;* Kinney v. Murray, 170 Mo. 700; Rosenwald v. Middlebrook, 188 Mo. 58.

Says Chancellor KENT: "I agree with those wise and learned judges who have declared that the courts ought to make a stand against any further encroachment upon the statute, and not to go one step beyond the rules and precedents already established." [Phillips v. Thompson, 1 Johns. Ch. l. c. 149.] That pronouncement we have adopted as a doctrine of our own. [Collins v. Harrell, supra, l. c. 302.]

In applying those rules and principles to the facts in judgment it is obvious there can be no two ways about it but that the decree *nisi* ought not to be disturbed, unless error was committed in ruling on the admission of the testimony. Possession is relied on. But the possession of Forrister is plainly referable to a contract of lease and the relation of landlord and tenant and not to any contract to make a will or to convey. He took and held possession as tenant—the death of Mr. Sullivan occurring in the last year of the lease. The amended bill refers to ''personal'' services rendered the deceased. The character of these services are not otherwise described. We suppose the pleader had in mind, under the head of ''personal'' services, those kindly offices rendered on the request of Mr. Sullivan by Mr. Forrister and his wife during his last sickness as detailed by the witnesses. But they seem to have been rendered because of emergencies arising from the peculiar ailments assailing Mr. Sullivan in his extreme old age, whereas the contract relied on by the pleader antedated those services by many years. There is nothing to show that such services were in the contemplation of the parties at the time the contract, if any, was made. The proof tends to show they were rendered on requests made from time to time, and not because of any prior contract involving the transfer of real estate.

If the contract was to the effect pleaded, viz., that Forrister was to perform valuable services in clearing and improving the different tracts of land occupied by him as tenant, then we meet with the same difficulty; for the terms of the contract, the character of the improvements, are not disclosed by the pleader. When it comes to the proof of performance, it consisted in repairing fences, cutting out fence corners, hauling manure, repairing the barn, etc., all of which are much more naturally referable to a lease, or to some contract incidental to a lease. Nor is it clear that all these repairs were made at plaintiff's expense. It

would be straining the testimony to refer them solely to a contract to make a will or to convey by deed. Again, the value or permanency of these improvements does not impress us. Ordinarily a lease provides for repairs, or, if repairs not contemplated by the lease are made by the tenant, adjustments are usually made from year to year. We cannot say, under the proof, that no such adjustments were made. Short settlements make long friends and Mr. Sullivan and Mr. Forrister seem to have been long friends. Reasoning from effect back to cause—i. e., *a posteriori*—such settlements were probably made.

If we go to the testimony for proof of the contract by admissions, our difficulties at once multiply. The witness Smith speaks of Mr. Sullivan's admission to his "aim," to what he "promised," to his intention to get Forrister from the Neece eighty over on the Stewart farm, of his intention "to give him that place instead of this one" and to his general friendly disposition; but his testimony goes little, if any, further. He testified to no contract nor to the terms of any contract and he declares Mr. Sullivan told him he didn't intend to make a will. If the memory of this witness is to be trusted, then Mr. Sullivan clearly contemplated "a fight" over his estate, looked on it as inevitable, faced it with complacency, and said "let them fight it out." His wanting Forrister to have a place is referable to the relation of landlord and tenant. His reference to a consultation with the Forristers and their willingness to go from one place to the other is naturally referable to the same relation.

The daughter's testimony relating to the contract would seem to indicate that Forrister was "to keep up the place for the place"—a rather singular contract. For if the place was his by virtue of the contract he was but keeping up his own place.

Rea's testimony was to the effect that Sullivan bought the Stewart place "for Forrister to work" and

his pricing the land to Rea at $50 per acre and Forrister's attempts to buy some of it of Mr. Sullivan before his death strongly tend to show there was not an abiding, recognized and certain contract existing between them that the place was to be given to plaintiff.

We shall not further recount or discuss the testimony witness by witness. There were conflicts in it which were for the chancellor to reconcile, since he heard the witnesses and was better able to deal with the factor of credibility than are we on appeal. The best that can be made of it is that it shows plaintiff was a faithful tenant, that at times Mr. Sullivan entertained and indicated a testamentary or giving disposition towards him, that he performed services during (and possibly before) Mr. Sullivan's last sickness under circumstances from which the law would imply an obligation to recompense him for their reasonable value. As the estate is solvent there appears no reason for equitable interference merely on that score. The broad fact remains that Mr. Sullivan did not seem to be a forgetful man. He is represented as just and punctilious in the performance of his contracts. He was importuned to make a will or conveyance and made none. Under such circumstances to assume the existence of a binding contract performed by plaintiff obligating Mr. Sullivan to will or deed the Stewart farm to him is but to further assume that Mr. Sullivan intentionally violated it. That assumption impugns the memory of a man who cannot answer for himself. The testimony indicates that Mr. Sullivan was a good business man. Mr. Forrister is not represented as illiterate or ignorant. Both were presumed to know that the law requires writings to evidence contracts relating to the transfer of land. Yet no writing exists. Its absence is not conclusive, but is of some significance. The fact that decedent paid all the taxes and on his death-bed expressed a desire that Feester, tenant on his home place, and Forrister, tenant on the Stewart place, should remain and pay

rent to his widow, taken with all other facts and circumstances, convinces us the decree below did equity. It cast the inheritance on blood kin. Inheritance flows naturally with the blood (Hockaday v. Lynn, 200 Mo. l. c. 466), and if its course is to be diverted such result is only accomplished by rigid compliance with the law.

III. Of error in ruling on testimony:

(1). It is assigned for error that plaintiff was excluded as a witness. He was offered in chief, presumably to prove the contract and performance. He was competent to prove neither. [Bishop v. Brittain Investment Co., 229 Mo. 699, and cases cited.]

(2). It is assigned for error that Mrs. Forrister, plaintiff's wife, was excluded. She was clearly incompetent under the statute. The case cited by counsel in support of her right to testify (Brown v. Foster, 112 Mo. 299) is not in point.

(3). It is argued plaintiff was competent to contradict the testimony of admissions made by him to witnesses for defendants. Whether that is so or not so is not in this case. He was not offered in rebuttal and the trial court was not tested on that point; therefore we reserve the question.

(4). It is argued that these admissions were inadvertently admitted, for that, as he was excluded, his admissions were not evidence. Plaintiff objected to the admissions and saved the point. We are cited to Wade v. Hardy, 75 Mo. 394. But we do not read that case as so holding. We know of no exception to the principle of law allowing admissions of a party to a suit made against his interest to go in against him, absent an express statute forbidding it. [Green v. Railroad, 211 Mo. l. c. 36, et seq.]

(5). Finally, it is assigned as error that the court heard evidence looking to a compromise, held it in its breast and thirty days afterwards excluded it. That course has been criticized. [Asbury v. Hicklin, 181 Mo. 669.] But there is not a particle of indication that

the judgment of the chancellor was swayed a hair's breadth by the testimony. The point does not touch the vitals of the case; for whether the testimony be in or out the decree could not have gone for him on the whole case.

The judgment is affirmed. All concur, *Woodson, J.,* in result.