Zola **HIGGINS**, Appellant,

v.

**P. F. RACHFORD, J. V. Rachford, Mrs. F. A. Hamilton, Mrs. Leo R. Robinson, Phillip Rachford, L. L. McAnelly, H. H. McAnelly, Grace Rachford, William Rachford, Mrs. Mildred Fletcher, Loren Virgil Rachford, William Herbert Rachford, Jay Harold Rachford, Paul LeRoy Rachford, Miss Kathyleen Rachford, Harvey Devere Rachford, Mrs. Arlene Harkey, Mrs. Bertha Burch, Clinton Buss, Fred Buss, Rodney Buss, Mrs. Henry Harris, Mrs. Carla Bullock, Mrs. Ruth Shelton, Mrs. Ocie Flower, Mrs. Arline Humston, Arden Cannon, Bluford Cannon, and Oden B. Calhoun, Administrator of the Estate of Clarence V. Jones, Deceased, Respondents.**

No. 46112.

Supreme Court of Missouri,
Division No. 1.

Dec. 9, 1957.

L. F. Cottey, Lancaster, Clare Magee, Unionville, for appellant.

William Y. Frick, Unionville, for respondents.

DALTON, Judge.

Action for specific performance of an alleged oral contract of Clarence V. Jones, deceased, to leave his entire estate, subject to the payment of debts, to plaintiff in consideration of personal services. The trial court denied relief and plaintiff has appealed.

Clarence V. Jones, a widower, died intestate in Unionville, Missouri, on January 20, 1956, at the age of 79 years. He left an estate consisting of real and personal property of the approximate value of $18,-000. It is admitted that he left no widow or direct descendants; and that the defendants, other than the Administrator, are his sole heirs at law.

A brief statement about the parties to the alleged contract is in order. In 1937, on account of ill health, Jones gave up a position as a traveling salesman and returned to Unionville to make his home with his mother. She died in 1945 and Jones lived alone in the family home until his death in 1956. The record shows that he continued to suffer from ill health; that he took a liberal amount of patent medicines and medicines prescribed by physicians; and that he used intoxicating liquor to excess. It is conceded that he "suffered from a long standing grossly enlarged and possibly malignant prostate gland, and also from a chronically diseased liver, possibly also malignant"; and that, at the time of his

death, "he also suffered a secondary anemia, possibly due to loss of blood through the bladder." There was testimony that in one year Jones bought $700 worth of one drug, in addition to patent medicines.

While the record shows Jones was in ill health over a long period it further shows that he looked after his farm and the making of repairs on his home in Unionville. Several of plaintiff's witnesses testified that, during most of the last ten years of Jones' life and up to the time of his last illness, he was a fairly vigorous man, got around all right, drove his own car, came to the barbershop for hair cuts, visited the taverns and a restaurant and was able to be up and about, except for specific periods of varying length when he was bedfast at his home and "pretty helpless." Others said, "He was sick all the time." He was continuously bedfast after October 1955. At one time his driver's license was revoked for a year, the date does not appear. A druggist, who had been out of business for several years prior to the trial, testified that he made delivery of medicines to the Jones' residence once or twice per week for a period of years; and that, for perhaps half of the time, he found Jones up and dressed. At intervals he saw Jones down town. Not only did Jones suffer from continuous ill health and the excessive use of liquor, but he was frequently despondent and, on February 25, 1948, and again on December 12, 1955, he was treated for self-administered over-doses of sleeping capsules. Other evidence showed that he was a changeable fellow, changeable in mind, one day one way and the next another and that he had made a number of wills, none of which were in evidence. It appears that one of the wills executed in January 1945, named Clyde Forbes as executor and trustee and left the bulk of the estate to charity of some sort.

Plaintiff, Zola Higgins, was a divorcee of undisclosed age, except as might be inferred from the fact that, as early as 1932, a divorce action was instituted against her for desertion for the space of one year.

She was operating a beauty parlor in Unionville, before and subsequent to 1937 and she had an apartment some five blocks from the Jones' home. She not only operated the beauty parlor, but was the operator therein during the period in question here. She had regular hours from 7:00 or 8:00 a.m. to 4:30 or 4:45 p.m., except perhaps during brief periods of Jones' extreme illness. The record does not clearly show when plaintiff and Jones began to associate with each other, but their association extended over a long period of time. Plaintiff's evidence is directed particularly to the period after 1945.

Plaintiff, in her petition alleged that, in October 1949, Jones came to her apartment and "stated that none of his relatives had done anything for him; that his health was becoming progressively worse; that he was morose and in need of companionship and that plaintiff was the only one who seemed to understand his peculiar moods and weaknesses * * * that he wanted to make an agreement with plaintiff whereby she would help care for his wants, so long as he might live, in consideration of having absolutely, whatever estate he might own at death, over and above indebtedness, (and) that he thereupon made the following proposition: That plaintiff refrain from having any social engagements with other men; that she devote all of her free time to him, if and when called upon; that she act as his confidential secretary; advise with him on business matters; see that he did not enter into any unwise business agreements while under the influence of liquor; be a companion to him; help him in his periods of despair; help nurse him in illnesses, when she could; assist in seeing that his house was kept decently clean and otherwise aid, advise and comfort him; * * * that he was positive he had sufficient funds to take care of himself and that plaintiff could be assured of having the farm and home clear; but that in any event, he would devise or convey to plaintiff his entire estate, subject to payment of debts * * * that she (plaintiff) considered said matter and did

assent to the terms of said offer and did agree to comply with and carry out the obligations imposed upon her, by such offer."

Plaintiff further alleged in detail the full performance of the contract by her in reliance upon the promise made by Jones. She also alleged the breach of the contract by Jones and alleged that deeds properly executed to her and describing his real estate were undelivered at Jones' death. She prayed specific performance and general relief.

Defendants denied the execution of the contract by Jones, the performance thereof by plaintiff, and further pleaded the Statute of Frauds and the Statute of Wills, Sections 432.010 and 474.320 RSMo 1949 V.A.M.S.

Plaintiff's evidence in support of the alleged contract tended to show that some time after the middle of December 1955, Jones told Myrl Baggs, a hotel and farm owner and a farm operator, as well as a former partner of Jones in the hotel and cafe business, that he and plaintiff had "come to an agreement if she would take care of me she is to take care of me (sic) and I am to give her the property when I am through with it." Jones also told Baggs that he didn't know what he would do if it wasn't for Zola (plaintiff) and said "she has been awfully good to me and understands me but I am going to make it worth her while. * * * He said that he had already deeded the property to her." Jones always told Baggs that Zola "was closer to him than anyone else and understood him better than anyone else." Jones didn't say what obligations rested on plaintiff "outside of she was to take care of him."

Jones told Pearl Pearcy, a Unionville carpenter who was doing carpenter work on his house, that "Zola had done more for him than anybody else, more like a daughter than any he had and that he had agreement that she was to take care of him as long as he lived and he was intending to give her everything that he had. He men-

tioned it a number of times. * * * He said they had an agreement and that she was to take care of him and he was going to give her everything that he had." The dates of the conversations were not given.

On August 21, 1953, Jones told William Wood, a Unionville citizen who had been away and had returned for his mother's funeral, that "there would be no trouble with his estate when he was gone, he had an agreement with Zola when she took care of him and helped him she would have what he had after he was gone * * * said he had a contract to that effect." Ray Quigley, brother-in-law of Wood, also was present and heard Jones tell Wood "there won't be any trouble over his estate either. He had everything fixed up so Zola would get what he had * * * that they had an agreement" and Zola would have what he had at his death.

Baggs, Pearcy, Wood and Quigley were the only witnesses who testified to admissions mentioning an alleged contract, but there was other evidence tending to show testimentary disposition or inclination to reward for services.

Jones told Ben Hymes, a taxi driver, who had hauled him many times during the eight or nine years before Jones died, that "Zola was just like a daughter to him, always helped him and done for him."

Jones told Dewey Pickering, a local barber, who had worked on him for many years, that "he aimed for Zola to have everything that he had when he was dead, in fact he said that he had it fixed," mentioned that "a number of times."

Jones told Leslie Powell, who lived on the Jones' farm from January 1954 until August 1955, that Zola was "the best friend that he ever had."

Jones told Clyde Forbes, an insurance man and former mayor of Unionville for four terms, that "Zola was the only one that ever done anything for him." He said that Zola took care of him when he was sick. The witness said Jones "thought a

lot of Zola and said so. * * * He liked to talk, you know."

Jones told Flossie Yount, who had operated a cafe in Unionville patronized by Jones, that "he had been sick and * * * he didn't have anybody to take care of him, only Zola, and he wanted her to have everything that he had when he was through with it."

Jones told John Richardson, a large landowner engaged in stock raising, that his property was going to Zola Higgins at his death and said it was all fixed up to go to her. The conversation was had about two years before Jones died.

Jones told Huster Stuckey, a co-owner of the local newspaper, that "he had previously intended to leave it (his estate) for a hospital, or for a park and so forth, but * * * that he had decided to leave it to Zola Higgins."

Jones several times told Eloyd Doyle, an inspector for the Missouri State Highway Department, that "Zola had been better to him than anyone, than any member of his family and he intended she should be taken care of with whatever he had left when he passed away."

Clarence Fullerton, the night marshal at Unionville, who helped Jones during his last illness, said that Jones called Zola "his little doll and said she was awful good to him."

On November 28, 1950, Jones wrote a letter to the Farmers Bank, Unionville, Missouri, and acknowledged it before a notary public, in which letter he stated: "I wish to make my Bank account a joint account with Zola Higgins so that she may make deposits and write checks as it give me assurance that all Dr. Hospitalization and the buriel bills can be paid promptly. She shall have access to box as her own and the box and contents and balance of the bank account shall go to the survivor. Please acknowledge whether or not acceptable."

The bank cashier, Albert Cassady, wrote Jones a letter in acknowledgment and Jones also subsequently conferred with him personally. The arrangement remained in effect until Jones' death but, so far as Cassady knew, plaintiff made no deposits of her own funds in the account. A balance in this account in excess of $1,000 was paid to plaintiff after Jones' funeral expenses were paid.

On November 9, 1950, Jones executed a warranty deed to Zola Higgins covering the two lots in Unionville (his home place) together "with all of the furniture and household goods of every kind and description with all clothing, and everything including jewelry, hardware and all personal items now belonging to the first party." On the same day Jones duly executed another warranty deed to plaintiff reciting a consideration of $1 and purporting to convey the 160 acre farm in question owned by him. It is agreed that the deeds had never been in the possession of the plaintiff and that she had never seen them until after the death of the grantor. They were found in Jones' lock box. There was evidence that Jones advertised the farm for sale some seven or eight times subsequent to the date of the deeds.

On September 13, 1954, Jones employed Charles Fitzgerald, prosecuting attorney of Putnam county, to prepare a bill of sale for him purporting to convey to plaintiff a 1952 Pontiac automobile. The instrument was duly executed and acknowledged and recited a consideration of $1900 in hand paid to the grantor. Mr. Fitzgerald further testified: "I told Mr. Jones that a bill of sale wouldn't pass the title * * *. Well, he said that he had the numbers of the automobile and he wanted the bill of sale drawn regardless so that he could put it in a safety deposit box. He said that Mrs. Higgins was his private secretary, or he referred to her as such, that she had aided him and assisted him for a number of years and that he wanted her to have everything that he had. That this was the

final thing, to get the transfer of the automobile over into her name."

About June 1954, Jones told Eva Mullenix, who had an apartment in the adjoining building to the one where plaintiff resided, that "he was all fixed—everything was to go to Zola * * * It all goes to Zola." "He said he had his deeds made * * * the deeds were made out to her." Mrs. Mullenix further testified that, "he said just that he deeded it to her (Zola) and she could do so as she pleased, * * * he said that he had fixed it * * *." Zola was present, "she was sitting right there and heard it and she never said a word."

On New Year's day 1956, Mrs. Mullenix was looking after Jones while he was ill. He asked for his clothes and got up and she assisted him as he went about the kitchen, living room and over the house and then back to bed. He told her it was his last trip, he then shook her hand and said, "It is all Zola's what a pal she has been, what would I have done without (sic) * * * the years she waited on me all the time, no one else could take her place."

Jones told Mrs. Mary Lou Minks, who rented a portion of his house and who during his last illness assisted as a nurse: "You are a nice renter, you keep things nice and neat and when I am gone this property belongs to Zola." Jones repeatedly made the statement that when he was gone the property belonged to Zola.

When a local tavern keeper borrowed $2000 from Jones, the note was made to Jones and "then to" plaintiff, but it was paid off before Jones died.

There was also in evidence defendant's exhibit A, hereinafter referred to, dated June 26, 1954, addressed to Mrs. Zola Higgins, a copy of which was apparently found in Jones' lock box after his death, in which he referred to her as "my confidential secretary" and in which he purported to direct her to record all deeds. The letter was witnessed and acknowledged.

Other matters referred to in the exhibit will be hereinafter mentioned.

We find no evidence in the record tending to fix a definite date for the alleged contract, nor to give its terms other than as hereinbefore stated. Appellant, however, says it is fairly inferable that the relationship between the parties "involved no contractual obligation on her part so long as his mother lived." Jones' mother died in 1945.

On the issue of alleged performance by plaintiff the evidence tends to show that Jones many times telephoned plaintiff at her shop and at her apartment and asked her to come out to his home when he wasn't feeling well; and that she promptly went. During the last eight or nine years of Jones' life, the local taxi driver, drove plaintiff to Jones' home on many occasions in the day or night, sometimes at her request and sometimes on instructions from Jones. During the last two years, plaintiff "largely" paid the taxi driver for his services. Mrs. Mullenix saw Jones at plaintiff's apartment many times during the last three years of his life. "He was up there approximately every evening and played cards awhile" with Zola and others. Jones often stayed for meals at plaintiff's apartment. When plaintiff couldn't get in touch with Jones by telephone at his home and knew he was out drinking, she would take Mrs. Mullenix and hunt him up and see that he got home safely.

Mr. Forbes had seen plaintiff at Jones' home "a lot of times" and had taken her there "many times" when Jones had asked him to. He had seen her clean the house, cook meals, wash dishes, scrub the floor and take care of Jones, as a nurse, when he was sick. Jones was ill "days at a time," either through intoxication or otherwise, and plaintiff would come and take care of him. She gave him medicines, when he was bedfast, and looked after him. Mr. Pearcy saw plaintiff at the Jones' home many times after Jones' mother died. Pear-

cy worked for Jones and visited him often in the evenings. Sometimes plaintiff would be waiting on Jones, sometimes cleaning the house and sometimes cooking. When Jones was bedfast plaintiff would visit him often. He said: "The only one I ever seen that done anything around there was Zola."

Dr. J. H. Holman never treated Jones when he was bedfast "for more than a few days." Once, after night, he found plaintiff looking after Jones, there was no one else there, it was not safe to leave Jones alone and plaintiff stayed that night at the doctor's request. Eldon Dickson, who delivered drugs to Jones, had seen plaintiff at the Jones' home many times "more or less taking care of him."

Jones was "virtually helpless" during his last illness and had no control of his kidneys or bowels. Plaintiff and Jones talked it over and extra help was secured, since plaintiff could not personally take care of Jones and, at the same time, operate the beauty shop. A number of persons were employed to assist in taking care of Jones so that he had attendants on hand day and night. The evidence shows that plaintiff was more or less in charge of operations at the house during this period, she hired some of the help, issued pay checks, gave instructions, assisted with meals and the care of the house and objected to the excessive use of intoxicating liquor by Jones and some of the employees. She also objected to the amount of money spent for liquor. During this period, plaintiff looked after Jones from five to eight p. m. each day, on Wednesday afternoons and on Sundays.

Defendant's evidence was very limited in its scope and, for the most part, it was limited to the last few months of Jones' life. It was directed to Jones' last illness and it tended to minimize the actual physical services of plaintiff to Jones during this illness, while at the same time more or less conceding that plaintiff was in charge, employing the help, directing activities, and assisting therewith, writing the checks and, at times, protesting the excessive use of liquor. It shows that plaintiff was also present when the inventory and appraisement of Jones' property was made and she was apparently helping with it, since she found a document, similar to defendants' exhibit "A" and, according to defendants' evidence, the plaintiff said: "This is what Clarence wanted me to do with it." Plaintiff confirmed the finding of the document, but said it had the word "void" written across its face. She did not remember the statement attributed to her.

Exhibit "A" was incorporated in the record by a stipulation reciting that, following the death of Clarence V. Jones, there was among his papers an instrument in the form of a letter, dated June 26, 1954, addressed to Zola Higgins, giving her directions, testamentary in character, as to the disposition he desired that she make of his property after his death, the general nature of which was to make two (2) benevolent bequests of $500 each, and give the balance to a New York charity, with 15% of the gross to go to said Zola Higgins. The instrument had been duly signed by Jones before witnesses and acknowledged by him.

Defendants also offered a witness who testified that, during the last four years and until his last illness, Jones kept company with her, came to see her at her home twice a week, and that she also rode around with him in his automobile, visited nearby towns, had dinner out with him or at her home at least once most every week, unless he was sick. She conceded he was bedfast a "considerable part of the time."

The court found the issues for defendants and against the plaintiff and stated: "The court finds that the evidence of the oral contract is not clear, cogent, and convincing, and that plaintiff did not prove beyond a reasonable doubt that the contract as alleged in plaintiff's petition was in fact made, and plaintiff is therefore not entitled to equitable relief requested."

■ The basic general rules for consideration in a case such as this are well stated in Jacquemin v. Mercantile-Commerce Bank & Trust Co., Mo.Sup., 234 S.W. 2d 789, 791 and Ver Standig v. St. Louis Union Trust Co., 344 Mo. 880, 129 S.W.2d 905, 907. They are not in dispute, and need not be set out herein. Specific rules particularly applicable will be later referred to. Of course we must review the evidence and reach our own conclusions as to its weight and value, with due deference to the trial chancellor's findings. The burden rested upon the plaintiff to establish the existence and performance of the alleged oral contract and its specific terms by evidence that is both clear and convincing. Glauert v. Huning, Mo.Sup., 266 S.W.2d 653, 662(3).

■ Appellant first contends that "implicit in the trial Chancellor's decree * * is a finding that there was a variance between the contract *as pleaded* and the contract *as proven*"; that "no objection was made to the admission of evidence showing the true terms and obligations of the contract and the parties' interpretation of it"; and that "the petition should now be treated as having been amended so as to conform to the proof," citing Section 509.500 RSMo 1949, V.A.M.S.; Jankowski v. Delfert, 356 Mo. 184, 201 S.W.2d 331, 335; Winters v. Terminal R. Ass'n of St. Louis, 363 Mo: 606, 252 S.W.2d 380, 386–387; Kimbrough v. Gross, Mo.App., 268 S.W.2d 56, 59–60; Feltz v. Pavlik, Mo.App., 257 S.W.2d 214, 217. Appellant says the only question in the case is whether the contract *as proven* entitled her to the relief prayed, and that the trial court never got around to ruling on that question. Appellant insists that "the case was simply tried by implied consent of the parties on the theory that all of appellant's proven services were called for by her contract and were rendered by her in performance of it"; and that "to all intents and purposes, we have an amended petition which exactly describes appellant's proven services as those which her contract required her to perform."

A careful reading of the record fails to show that any issues not raised by the pleadings were tried by express or implied consent of the parties. Plaintiff's evidence of necessity took a wide range. Maness v. Graham, 346 Mo. 738, 142 S.W.2d 1009, 1012, 130 A.L.R. 225. Appellant concedes the necessity for such a wide range of evidence when she says (1) "that the existence of the contract, the parties' understanding and interpretation of its terms, the fairness of the contract, the purpose it was designed to accomplish, and the propriety of decreeing its specific enforcement may all be established by indirect evidence showing the relations of the parties, their circumstances and conduct at the time the contract was made, and their course of dealing with each other thereafter"; (2) that "appellant was disqualified as a witness for which reason a certain latitude is allowable to the court in drawing reasonable inferences from the piecemeal testimony of other witnesses on which she was obliged to rely"; and (3) that "admissions against interest made by the deceased, even though they be in the form of conclusions, are competent evidence to establish the facts to which they relate."

Clearly the plaintiff could present her evidence, bit by bit, but her evidence was directed to the proof of the oral contract pleaded and to her performance thereof and to the breach by Jones. The testimony of the various witnesses was not such that a motion to strike would have been sustained on the ground that the testimony tended to show a different contract from the one pleaded. The evidence was competent under the pleadings as drawn. Since all the evidence was clearly directed to the proof of the contract pleaded, there was no waiver by defendants, nor any implied consent to try different issues than those presented by the pleadings and, on this record, the pleadings were not amended as contended by appellant.

Appellant insists that the only question in the case is "Did the evidence establish

*any* contract between appellant and deceased which has been fully performed by her and which is susceptible of specific performance and which requires the court to grant her that relief in order to avoid making her the victim of a fraud?" Appellant in effect admits that the contract pleaded was not proven, but insists that a different oral contract was *proven*, and that full performance thereof was *proven*, so that she is entitled to a decree in equity granting specific performance of the contract.

To obtain specific performance of an oral contract to devise or deed land in a case such as this, where plaintiff contends she has fully performed, certain specific well settled rules must be complied with. The applicable specific rules are fully stated in Forrister v. Sullivan, 231 Mo. 345, 373, 132 S.W. 722. And see White v. Cochran, Mo.Sup., 248 S.W.2d 854; Herman v. Madden, 349 Mo. 447, 162 S.W.2d 268, 269; Farina v. Madden, Mo.Sup., 163 S.W.2d 82, 85(4); Steere v. Palmer, 359 Mo. 664, 223 S.W.2d 391, 393.

■ One of these rules is that "the terms of the contract should be so clear and definite as to free it from ambiguity, and leave no doubt in certainty of terms or intendment." Forrister v. Sullivan, 231 Mo. 345, 373, 132 S.W. 722, 730. Another is that "the acts relied on to show performance must in their nature be referable alone to the very contract sought to be performed. * * * In a word, the acts relied on to show performance must point unerringly to the contract in suit and to none other." Forrister v. Sullivan, 231 Mo. 345, 373, 132 S.W. 722, 730.

■ We need not here consider the credibility, weight and value of the testimony concerning the alleged oral contract, because if it is true it is insufficient. The testimony wholly fails to show that any such oral contract as is required by the first above mentioned rule was, in fact, made. The contract pleaded was not proven and the evi-

dence produced failed to show any contract with clear, definite and certain terms free from ambiguity. There was no testimony from which the date or the terms of any such contract clearly appear. The words "to take care of him as long as he lived" are not definite, certain or free from ambiguity. No standard is fixed by which to measure performance. The words "take care of" are so general in meaning as to be meaningless when considered with the admitted facts concerning the relationship of the parties. No definite meaning appears. They do not specify what acts plaintiff was to perform and they offer no guide by which performance or non-performance under the circumstances of this case could be determined.

Appellant seeks to escape the absence of evidence as to any contract with definite and certain terms by contending that Jones accepted the acts of plaintiff shown by plaintiff's evidence as full performance of the contract on plaintiff's behalf. Appellant says "there is good reason and authority for the holding that whatever the parties see fit to accept as performance of the contractual obligations will be so regarded by the courts." This contention does not aid us since the evidence fails to show the existence of a contract with clear and definite terms and free from ambiguity by which to measure the performance relied on. We must reject appellant's contention that "the issue as to what services were called for by the contract was tried by implied consent of the litigants as though the proven services were the ones, and the only ones, actually called for by the contract." No such implied consent may be inferred from the record in this case.

We approve the trial court's finding that the evidence of the oral contract is not clear, cogent and convincing. Plaintiff did not prove beyond a reasonable doubt that the contract, as alleged in the petition, or that any other specific contract with definite and certain terms free from ambiguity was in fact made. Nor did plaintiff's

evidence clearly show that the services rendered, such as they were, were solely referable to the very contract pleaded, or even to the contract attempted to be shown by plaintiff's evidence. Schebaum v. Mersman, Mo.Sup., 191 S.W.2d 671, 675(6). Specific performance was properly denied.

One further matter requires our attention. Defendant's answer stated: "If plaintiff's evidence demonstrates that she rendered any services to Clarence V. Jones for which she has not already been amply compensated, defendants stand ready to do equity, and hereby offer and tender to plaintiff any amount to which she may prove herself entitled for services rendered to Clarence V. Jones, and hold themselves in readiness to pay any such amount."

After the court found for defendants, the defendants filed an after trial motion by which they asked the court to make an explicit finding as to whether or not plaintiff rendered any compensable services to Jones, and if so, the amount to which she was entitled. The motion was overruled.

We think the record in the case clearly shows an intention by Jones to use undelivered deeds for testamentary purposes and to avoid administration of his estate. The record shows that plaintiff knew of the existence of the deeds and could reasonably have expected compensation for the services she rendered. In such situation the judgment should be reversed and the cause remanded to give her an opportunity to recover the value of her services. Schebaum v. Mersman, supra; Selle v. Selle, 337 Mo. 1234, 88 S.W.2d 877, 883.

The judgment, in so far as it denies specific performance, is affirmed, but otherwise reversed and the cause remanded with directions to ascertain the reasonable value of the services rendered by plaintiff and enter judgment therefor against the estate.

All concur.