John STAEHLE, Appellant,

v.

MERCANTILE TRUST COMPANY, a Corporation, Peter Goetz, Alice Bohak, Joseph Goetz, Reginald Goetz, Irene Ackermann, the Unknown Lineal Descendants of Irene Ackermann Related to Her by Blood Living at the Time of Her Death, and Mrs. Franz Mayer, and Their Unknown Heirs, Grantees, and Successors, Respondents.

No. 46961.

Supreme Court of Missouri,

Division No. 1.

July 13, 1959.

Motion for Rehearing or to Transfer to Court en Banc Denied Sept. 14, 1959.

Eugene H. Buder, St. Louis, Stockham, Roth, Buder & Martin, St. Louis, of counsel, for appellant.

William Kohn, St. Louis, J. M. Todd and Albert G. Trester, St. Louis, of counsel, for respondents.

WESTHUES, Judge.

Plaintiff John Staehle filed this suit to set aside an indenture of a revocable trust executed by Theresa Stachle on June 24, 1955. Plaintiff is claiming the entire fund which at the time of trial amounted to slightly more than $30,000. Plaintiff claims the fund on the theory that the trust was created without his consent out of money earned or acquired by him; that the money was held by Theresa for their joint benefit as joint tenants and for the survivor. Theresa died March 26, 1956. After a hearing, the trial court denied plaintiff any relief and from the judgment dismissing his petition with prejudice, plaintiff appealed.

■ The sole question on this appeal is whether the trial court should have entered a decree for plaintiff. This being an equity case, it is reviewable de novo on appeal.

The following statement of facts is justified by the record: Plaintiff John Staehle was born in Schwenningen, Germany, in 1879. He came to the United States in 1909. He lived in Brooklyn, New York, for a few years and there he met Theresa Goetz with whom he lived from then on until Theresa died in 1956. John and Theresa moved to Springfield, Massachusetts, where their only child was born in 1913. She was named Mildred Staehle. Mildred married Ervin Schenck in 1935 and in 1947, she obtained a divorce from him. No children were born to this union. Mildred died on September 20, 1954. About 1914, John and Theresa with their child moved to St. Louis, Missouri, and lived there until the death of Theresa in 1956. Shortly thereafter, John returned to his native land of Germany. All of the transactions affecting this lawsuit occurred in the City of St. Louis, Missouri.

John had been a clockmaker in Germany. When he came to St. Louis, he worked in and conducted an automobile repair shop. Later, he and one Hoeft were partners for 10 or 15 years in the business of sharpening and grinding tools. In June, 1921, property at 3504 South Grand Avenue was purchased and title was placed in their joint names (John and Theresa's). The price paid was about $3,500 or $4,000. For a number of years, they lived at this place and John conducted his business on the lower floor of the building. From time to time, the property was mortgaged for various amounts, probably to make improvements. These mortgages were all released of record in later years. In January, 1931, a residence at 6530 Parkwood Place was purchased and title was placed in Theresa's name. Other real estate deals were made but since they have no material bearing on the issues involved we shall not recite the details.

The Parkwood residence was occupied as the home until John returned to Germany. The first floor of the Grand Avenue property was rented from 1929 to about August, 1956. The title to the Grand Avenue property was in the joint names of John and Theresa until September, 1930, when by deeds it was conveyed to Theresa.

She held title until October, 1950, when title was placed in the joint names of John, Theresa, and their daughter Mildred. Mildred, as above noted, died on September 20, 1954, which left title in John and Theresa. Also, in October, 1950, title to property at the Parkwood address was placed in the names of all three Staehles. The total rent collected from the Grand Avenue property from 1929 to 1956, as calculated in appellant's brief, was $84,160. At the time of the death of Theresa, titles to the Grand Avenue property and the Parkwood property were in the names of John and Theresa as joint tenants.

About 1945, John sustained a serious injury when a car ran over him. Plaintiff, in his brief, says that one of the injuries sustained was a broken hip. For this, he received $5,000. In a deposition taken in Germany, John described his condition: "Yes, sure, they paid me $5,000.00 for that because I could not do any more, I could not walk any more only with two sticks under the arms." Due to the inability of John to work, he and his partner Hoeft sold their tool grinding business. John received $3000 as his share.

After Theresa's death, John sold the Grand Avenue and Parkwood properties for approximately $41,000 and also drew from a bank the sum of $4,267.90 which had been on deposit in the joint names of John and Theresa. The total amount John obtained from these three items held as joint property was slightly in excess of $45,000.

After the death of Theresa, it was discovered that on June 24, 1955, she had executed a trust instrument whereby she had transferred to the defendant Mercantile Trust Company $18,589.43. On November 7, 1955, she added $9,186.30. The trust instrument provided that on her death, the fund should be distributed in the following manner:

"⅜ to the Grantor's brother, Peter Götz, of Pelöfi Telsp, Frilasliget, Pest Megge, Hungary, if living at the time of Grantor's death, and if not, to Grantor's niece, Mrs. Alice Bo-

hak of Pelöfi Telsp, Frilasliget, Pest Megge, Hungary.

"⅛ to Grantor's nephew, Joseph Götz, of 13 Livingston St., W. 9, London, England, if living at the time of Grantor's death, and if not, to Grantor's nephew Reginald Götz, of 13 Livingston St., W. 9, London, England.

"⅛ to Grantor's niece, Irene Ackermann, of Euchenberg, Moselle, France, if living at the time of Grantor's death, and if not, per stirpes to her then living lineal descendants related to her by blood.

"⅛ to Grantor's niece, Mrs. Franz Mayer, of Euchenberg, Moselle, France, if living at the time of Grantor's death, and if not, to her daughter, Irene Ackermann of Euchenberg, Moselle, France.

"whereupon the trust herein created shall cease and terminate."

(In the defendants' answer, it is stated that the name of Gotz was misspelled in the petition as Goetz. The writer of this opinion thinks "Goetz" is the correct spelling.)

It is this fund that plaintiff says should be decreed to be his property. He claims that this fund should have been in a joint account and that the survivor was entitled thereto. It appears from the evidence that Theresa and her daughter Mildred had a number of joint bank accounts in various banks. One of these began in Theresa's name only with a deposit of $50.89 in April, 1942. It grew to an amount of $6,639.57 by February, 1950, when it was transferred to the joint names of Theresa and Mildred. At the time of Mildred's death, it amounted to $8,984.56. Thereafter, it increased to $9,186.30, and, on November 7, 1955, this amount was added to the trust fund. Of this trust fund, $4,000 was money which had come from Mildred. Other accounts in banks in the joint names of Theresa and Mildred were withdrawn by Theresa about

June, 1955, and placed in the trust fund at the time of its execution. No money was placed in the trust fund that was on deposit in any bank in the name of plaintiff or in a joint account with plaintiff as a joint owner.

It was alleged in the petition, and the defendants do not seem to contend otherwise, that "Plaintiff, John Staehle, lived for many years, since about 1912, with Theresa Staehle, born Theresa Goetz, as her husband, and she lived with him as his wife, and took his name, but they were never married to each other, either by ceremony or by operation of law." Plaintiff, to a great extent, relies upon that fact, that is, that Theresa was not his wife, as a reason the trust fund belongs to him. Note what is said in plaintiff's argument: "The total rent from South Grand was about $84,-160.00; deducting that which theoretically accrued to Mildred ($4,700.00), it was about $79,460.00. Dividing that amount between Theresa and John on equitable principles, to each accrued $39,730.00. But out of those amounts first had to come the taxes, mortgage interest and other charges against the rental property itself, and then out of the balance each of them was equally obligated to pay his or her own living expenses. *John had no legal obligation to support Theresa, not being married to her.*" (Emphasis supplied.) It is further argued that Theresa did nothing to earn any money and all the money, including the fund (except $4,000 from Mildred) was earned and accumulated by plaintiff.

If, as plaintiff says, "John had no legal obligation to support Theresa," what were his obligations? What were Theresa's rights? If no obligation to support, then surely John was obligated in some way to compensate Theresa for keeping house for him for forty years or more. As noted above, John was unable to work after 1945. He had been seriously injured and was in need of care and attention. To illustrate the faithfulness with which Theresa took care of John, we call attention to evidence given in a deposition by Herbert H. Frahm,

an Assistant Trust Officer for the defendant Mercantile Trust Company, who had aided Theresa in creating the trust fund. This witness was called to the home to discuss the question of what to do because Theresa's health had failed and she was not able to take care of the household. We quote a part of the testimony given in the deposition:

" 'Apparently Mrs. Staehle's physical condition was deteriorating to the extent that all of them present felt she would be unable to carry on her household duties very much longer, and they asked my advice as to what they could do in the event she became incapable of taking care of their home; I suggested that if their financial situation permitted, they could enter a nursing home or an old folks' home or convalescent home.

\* \* \* \* \* \*

" 'The conversation was rather lengthy, but it was along the general line of discussion as to what Mr. and Mrs. Staehle could do if Mrs. Staehle became incapable of carrying on her household duties. As I stated, I suggested they might consider living in an old folks' home, and that entailed a discussion of their financial condition, and Mr. Staehle said that he and Mrs. Staehle, I believe, owned a piece of property on Grand Avenue, I don't know the exact location, and they owned the residence in which the conversation took place, and he questioned whether I thought there would be sufficient amount of funds available in the event those properties were sold to take care of their future needs.' "

It may be noted here that Theresa died three days later. So, it is evident that Theresa, in sickness and in health, in troubled times and good times, in times when John was drinking (there was evidence of such fact) and when sober, for more than forty years was a faithful housekeeper for John. Not only that, the ques-

tion may well be asked, how much would it have cost John for nursing and care from 1945 to the time of Theresa's death in 1956 when John was disabled and could not walk without aid and was almost blind? Perhaps John, and also Theresa, thought that Theresa should have some security for herself and her daughter. The record justifies such a deduction. Note what plaintiff's witness Ervin Schenck, the former husband of Mildred, had to say:

"A. Well, I don't remember exactly what time it was, but it was sometime in the summer of '46, or I would say about six or seven months after I left there. One particular evening when we finished eating the evening meal, and she mentioned, Theresa said, 'John, you get ahold of Mr. Buder and see that all this deeds for the property,' meaning the one where they lived at 6530 Parkwood and the one on Grand Avenue and their accounts were taken care of so that everything would go to the last member of the three. She wanted it all fixed so that all three names would appear on everything so that the survivor would get everything."

Mr. Oscar Buder testified that he had taken care of legal business for John; that in 1950, or 1952, Mildred complained "about her father's drinking" and wanted him, Buder, to come to the house. We quote the following from Mr. Buder's evidence:

"A. I told him that Mildred says while they have put this money in the joint names of her mother and herself, it was all done for his good because he was apt to give the money away as on occurrences that she had observed before. When they would withdraw money and give it to him, it would be gone and he would come home intoxicated and he denied all that. He said that he does have a drink or two, but he always knows what he's doing, is what he said, and I think I said, 'Well, John,' I knew that John and his wife never did get along well together, be-

cause he had some trouble in court in which I represented them and got things settled. I said, 'Now John, you know Mildred wouldn't do anything against your interest.' And he said, 'No, I trust Mildred, but I don't trust my wife,' and then his wife went up in the air and she started saying he hadn't treated her right. I said, 'Now let's get this money matter settled,' and I said, 'Now John, you are not as young as you used to be and you are in bad shape. You can't see and you are weak.' I said, 'Chances are that both Mildred and her mother, your wife, will outlive you and that Mildred will outlive you both and she will get this estate without any cost.' He said, 'I have no objection if that's the way that she gets it, but I want to know that I own that money and that she gives it to me when I want it and when I need it.' And that was that. I said, 'John, you behave yourself,' John grabbed my hand and he said, 'Okay.' And that was it. I suppose I was there fully two hours in the afternoon."

It is evident from Mr. Buder's testimony that Theresa thought she was entitled to something and that she had aided in acquiring the property they had. It may be noted that when John said he did not trust his wife, Theresa protested; further, that the titles to all property were such that in the case of the death of Theresa and John, Mildred would be the sole owner.

We can conceive of no theory on which a court of equity should grant plaintiff any relief. The property on Grand Avenue, as well as the residence on Parkwood, was in Theresa's name alone for many years. There were discussions of making arrangements for joint ownership for a number of years. In October, 1950, these two valuable properties were transferred by deeds from the name of Theresa to John, Theresa, and Mildred. There was also a joint bank account in the names of these three persons. Is it unreasonable to suppose that at that time, and prior thereto, the parties had had

discussions about all of these matters and settled them in the way they did? The evidence in the record showing the contrary is of little probative force. The record does not show the reason that the property on Parkwood was first placed in Theresa's name and left there for many years nor does the record show the reason the Grand Avenue property was placed in Theresa's name where it remained from 1930 until 1950. Theresa, in 1950, surrendered the title in the two most valuable pieces of property the pair had acquired and placed them in the joint names of John, Theresa, and Mildred. Theresa evidently loved her daughter very much. John, in his deposition, when asked when Theresa died, stated, "A year and one month or two months later. She could not stand it that Mildred died. That was the trouble." Did Theresa, while Mildred was alive and after her divorce, make provisions for her daughter by the joint bank accounts? That is not a violent deduction from the evidence. We note further in John's deposition that he referred to Theresa as his wife. When John was asked if he received the $5,000 that was paid as damages for his injuries, he replied, " 'Not me, I saw no penny any more. My wife took it and it went to the bank again.' " At another point in his deposition, when he was asked as to who paid the household bills, he gave the following testimony:

" 'Q. Did you pay the household bills, for the groceries? A. Absolutely.

" 'Q. Did you pay those bills yourself? A. Absolutely.

" 'Q. Or did somebody else pay them for you?' "

An objection to this question was sustained but John answered the question on plaintiff's offer of proof as follows:

" 'A. My wife, she had the money and she could pay.' "

During the time between 1945 and 1956, when John was disabled, he was in a hospital on several occasions. After Mildred died, John seems to have broken his hip a second time and was in St. Anthony's Hospital. On another occasion, he was at St. Mary's Hospital. The hospital and doctor bills were evidently paid out of money that had been saved. One of the hospital bills was at least paid in part with money obtained from the sale of cemetery lots. Their regular income during those years was rent of $300 per month from the Grand Avenue property and an old age pension.

As we view the evidence, plaintiff's claim is devoid of any equity. Plaintiff, in his brief, says the trial court erred in failing to find that an oral agreement had been made by the three Staehles to the effect that the fund claimed was to be held jointly. We find the evidence to establish such an agreement unreliable and of little probative force. Schenck, the former husband of Mildred, testified as to conversation he heard between the Staehles as to proposed property settlements. This was long before 1950 and, furthermore, this witness did not testify as to any definite agreements. The evidence of Mr. Buder in no way established any definite agreement. His evidence does indicate that he did not place much confidence in what John said to him. Mr. Buder's advice to John was that he should behave himself. When Theresa, in 1955, went from bank to bank to collect the deposits which had been held in the joint names of Mildred and herself, she was on one occasion accompanied by a Mrs. Shofro and on another by a Mrs. Haubrich. These good ladies testified as to statements made by Theresa that John did not know she was setting up this trust fund; that if he knew it, he would kill her. We can surmise how interested these witnesses were in Theresa's business. Their evidence was of little value. Willey v. Talkington, Mo., 312 S.W.2d 77, loc. cit. 79(2). Suppose John did not at this time know what funds he or Theresa had, that fact does not alter the situation. The settlements as to property rights were made

in 1950 when Theresa surrendered title to the two principal pieces of property. It is evident from this record that John, soon after 1950, became senile. His evidence given by deposition clearly so indicates. Plaintiff, through his attorneys, takes the position (perhaps because of John's senility) that he owed Theresa nothing; that she was a chattel to be pushed aside at will. To John's credit, we may say that the record shows he did not treat Theresa as a chattel during the forty-four years of their life. True, the record shows they had their difficulties but they worked together and accumulated quite an estate through hard work. The evidence showed John depended on Theresa to handle the finances; that Theresa, through her work, saved John large sums of money. Then, too, they lived together as husband and wife, held themselves out to the world as such, and John in this very lawsuit referred to Theresa as his wife. We need not decide the point but John and Theresa were probably, according to the old common law, husband and wife.

■ Plaintiff cites Feltz v. Pavlik, Mo. App., 257 S.W.2d 214. We need say no more about that case than that a joint bank account of husband and wife was there involved and the husband fraudulently transferred the money to his brother. In Allen v. Kelso, Mo., 266 S.W.2d 696, the property sued for had been in the joint names of husband and wife. An added fact involved in the transaction under consideration was that one of the parties was held to be mentally deficient. The evidence in the case before us does not justify a finding that there was an oral agreement to the effect that the trust fund was to be the joint property of John and Theresa. Higgins v. Rachford, Mo., 307 S.W.2d 411, loc. cit. 419(4).

■ Plaintiff says that if the evidence failed to sustain an oral express trust, the court should have declared a resulting trust in his favor. In the brief, plaintiff says, "A case like the one at bar would appar-

ently be quite familiar to the courts of Massachusetts. In a long line of cases the Supreme Court of Massachusetts has held that a husband may establish a trust in funds which he delivered to his wife for the purpose of paying expenses for their support and of holding the remainder of the funds for his benefit or their mutual benefit. Levy v. Levy, 1941, 309 Mass. 486, 35 N.E.2d 659; Zak v. Zak, 1940, 305 Mass. 194, 25 N.E.2d 169." It seems that plaintiff is taking inconsistent positions. The argument was advanced that plaintiff owed Theresa no obligation because the parties were not husband and wife. Now, it is contended that a resulting trust should be decreed because plaintiff turned funds over to his wife for the purpose of paying household expenses and the remainder to be held for the husband's benefit. Even if we were to assume that John and Theresa were legally husband and wife, which plaintiff insists they were not, the proof falls far short of supporting any theory upon which a trust in favor of plaintiff could be decreed. 89 C.J.S. Trusts § 158, pp. 1079–1088. Swon v. Huddleston, Mo., 282 S.W.2d 18, loc. cit. 25(7, 8), 55 A.L.R.2d 205.

Plaintiff says further that the trial court erred in taking into consideration the fact that plaintiff was the joint owner of a bank account of $4,672.90 and that he obtained the money from the sale of the Grand Avenue and Parkwood properties. In view of the fact that, in 1950, Theresa relinquished her sole ownership in these parcels of real estate, it is our opinion that such evidence was very material. It showed that Theresa surrendered a very valuable property right. Had she not transferred title to joint ownership, plaintiff would have had no interest therein at Theresa's death. That is so if plaintiff's contention be true, that Theresa was not his wife. We are of the opinion that the arrangements made by these parties in the manner in which they made them were entirely reasonable; further, that the final result was an equitable distribution.

We have considered the case at length, and have concluded that the trial court was fully justified in denying plaintiff any relief.

The judgment is hereby affirmed.

All concur.